**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| JACOB RAMIE PRATT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | 3:10-cv-00615-RCJ-VPC |
| vs. ) | |
| ) | |
| JAMES MINNIX et al., ) | **ORDER** |
| ) | |
| Defendants. ) | |
| ) | |

This prisoner civil rights case arises out of the alleged use of excessive force during two cell extractions at Ely State Prison ("ESP") on January 31, 2010. Pending before the Court is the magistrate judge's Report and Recommendation ("R&R") (ECF No. 34) on Defendants' Motion for Summary Judgment (ECF No. 22). For the reasons given herein, the Court rejects the R&R and grants the motion for summary judgment.

**I.   FACTS AND PROCEDURAL HISTORY**

Plaintiff Jacob Ramie Pratt is a prisoner at ESP. (*See* Compl. 1, Dec. 16, 2010, ECF No. 5). He alleges that during cell extractions on January 31, 2010, he was assaulted and beaten by correctional officers though he did not resist. (*See id.* 3). He alleges those officers prevented him from receiving medical care to treat his injuries for five days. (*See id.*).

Plaintiff sued Minnix, Deeds, Perkins, Horsley, and Postman pursuant to 42 U.S.C. § 1983 in this Court on two counts: (1) Eighth Amendment violations for the cell extractions; and (2) Eighth Amendment violations for failure to treat subsequent injuries. Defendants have moved for summary judgment, and the magistrate judge has recommended denying the motion.

## II.    SUMMARY JUDGMENT STANDARDS

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). In determining summary judgment, a court uses a burden-shifting scheme:

> When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case.

*C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations and internal quotation marks omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the

claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

At the summary judgment stage, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

**III.   ANALYSIS**

To state a claim under § 1983, a plaintiff must allege: (1) that a right secured by the Constitution or laws of the United States was violated; and (2) that the alleged violation was committed by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988). Even if a constitutional violation can be shown, individual defendants enjoy qualified immunity where the right was not clearly established at the time of the violation. Under *Saucier v. Katz*, the district court uses a two-step procedure to determine whether an official is entitled to qualified immunity: (1) the court asks whether there has been a constitutional violation; and (2) if so, the court asks whether the state of the law was clear such that a reasonable person in the defendant's position should have known his actions violated the plaintiff's rights. 533 U.S. 194, 201 (2001). Under *Pearson v. Callahan*, it is within the sound discretion of the district court which *Saucier* step to employ first; the court may examine the qualified immunity step first in order to avoid constitutional holdings where a defendant will be free from liability due to

1  qualified immunity. 555 U.S. 223, 236 (2009).

2  **A.  Count I - Excessive Force**

3  The Fourth Amendment's prohibition against unreasonable seizures protects persons from excessive force during a seizure. *Graham v. Connor*, 490 U.S. 386, 395 (1990). Although seizures by the police in open society are normally examined under the Fourth Amendment, an excessive force claim may be brought under the Eighth Amendment in the prison context. Because of the unique and challenging context in which they operate, courts afford prison officials much wider deference in Eighth Amendment excessive force claims than they afford police officers in Fourth Amendment excessive force claims:

> The Supreme Court has held that "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." Because of the importance of internal security within the corrections facility, "[p]rison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry." "[Prison practices] must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." Because "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions," prison administrators "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."

*Redman v. Cnty. of San Diego*, 942 F.2d 1435, 1440–41 (9th Cir. 1991) (quoting *Bell v. Wolfish*, 441 U.S. 520, 540, 546–47) (1979) (alterations in original; citations omitted).

> *The core judicial inquiry . . . [i]s not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.* When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated . . . whether or not significant injury is evident.
>
> This is not to say that the absence of serious injury is irrelevant to the Eighth Amendment inquiry. [T]he extent of injury suffered by an inmate is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation. The extent of injury may also provide some indication of the amount of force applied.
>
> . . . .

Page 4 of  13

1
2           Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune
3           to escape without serious injury.

4   *Wilkins v. Gaddy*, 130 S. Ct. 1175, 1178–79 (2010) (citations and internal quotation marks

5   omitted; alteration in second paragraph original; emphasis added).  Plaintiff therefore has a

6   heavy burden in proving unreasonable force in the context of a cell extraction.

7           Plaintiff alleges that on January 31, 2010, Defendant Corrections Lieutenant James

8   Minnix ordered other Defendant officers to extract inmates who had flooded their cells. (*See*

9   Compl. 4).  Plaintiff alleges Minnix stated that any inmates challenging his authority would

10  "bleed like bitches." (*See id.*).  Plaintiff admits that at about 6:00,[1] he purposely flooded his cell

11  (cell 44 of Unit 4A) by clogging his toilet. (*See id.*).  A guard, whose identity Plaintiff does not

12  allege, told Plaintiff at 6:15 that he would be extracted because of the flooding. (*See id.*).  At

13  approximately 6:30, correctional officers arrived at Plaintiff's cell to extract him. (*See id.*).  The

14  officers told him to "cuff up," presumably referring to the procedure whereby an inmate is made

15  to handcuff himself before the officers enter. (*See id.*).  When Plaintiff asked why he was being

16  extracted, the officers "gassed [him] with chemical agents," presumably pepper spray. (*See id.*).

17  Plaintiff does not allege whether he had complied with the "cuff up" order. (*See id.*).  At

18  approximately 6:35, he was gassed again, without having been told again to "cuff up." (*See id.*).

19  At approximately 6:40, Defendants Minnix and Horsley lined up approximately ten correctional

20  officers outside Plaintiff's cell, and Minnix told Perkins to turn off the video recorder. (*See id.*

21  4a).  The officers then opened the cell door and extracted Plaintiff. (*See id.*).  At that time, an

22  officer whom Plaintiff does not identify accused Plaintiff of attacking him with a weapon, but

23  Plaintiff denies having done this, though he admits "a weapon was recovered." (*See id.*).

24  Plaintiff alleges that he was punched in the face by an officer, whose identity he does not allege,

25

---

[1] Plaintiff does not specify whether a.m. or p.m.

Page 5 of 13

1  ten to twelve times after he was fully restrained, resulting in a swollen eye, a broken nose, and
2  cut lips. (*See id.*).

3  While being taken away, a different officer, whose identity Plaintiff does not allege,
4  rammed Plaintiff's head into a slider door, and Defendants Postman and Deeds slammed
5  Plaintiff's head into a wall several times. (*See id.*). Plaintiff also alleges that the officer who
6  rammed his head into the slider door and a third unknown officer pinched and twisted his skin
7  and nipples several times. (*See id.*). Minnix twice told Postman, Deeds, and other officers to
8  "take [Plaintiff] to the ground," and each time officers body slammed Plaintiff to the ground and
9  beat his head against the floor, smearing his blood on the floor. (*See id.*). Later, Postman
10 slammed Plaintiff's head into two slider doors while holding onto his hair. (*See id.*). While
11 kneeling in his cell to have his leg irons removed, Deeds slammed Plaintiff's head into the wall
12 multiple times. (*See id.*). At one point, an officer pulled a chain that was connected to Plaintiff's
13 handcuffs through the food slot on his cell door, causing Plaintiff to cut his arms. (*See id.* 9).

14  Plaintiff's injuries consisted of a severely swollen face, a concussion, many cuts, a cut
15 and swollen lip, a broken nose, loosened teeth, a bleeding left ear, wrist and ankle cuts, and
16 "disjointed" fingers and thumbs. (*Id.*). Plaintiff still suffers from severe headaches, blurred
17 vision, and sensitivity to light. (*Id.*).

18  Plaintiff alleges that after the beatings, officers took him to see medical personnel, but
19 Minnix prevented them from taking any photos or videos of his injuries and had Plaintiff held
20 tightly to the wall so that the medical personnel could only wipe his face with gauze. (*See id.* 5).
21 Plaintiff alleges that a fourth officer, whose name he does not allege, and who witnessed at least
22 part of the alleged beatings, ignored Plaintiff's attempts to obtain further medical treatment once
23 he was back in his cell. (*See id.*). When Plaintiff asked for a medical kite to fill out, an
24 unidentified officer stated, "The senior will not let me give you anything." (*Id.*). Prison officials
25 gave him no medical treatment for five days, he was not allowed to shower, and his cell was not

1   washed, leaving the chemical spray residue to irritate his skin and seep into his wounds. (*Id.*).

2   Defendants relate the event differently, and they attach seven exhibits in support of their
3   motion. First, Defendants attach a copy of "Ely State Prison Operational Procedure 405 Use of
4   Force." (*See* Mot. Summ. J. Ex. A., Mar. 15, 2011, ECF No. 22-2, at 2). That document,
5   however, is not relevant to whether the use of force in this particular incident was reasonable
6   under constitutional standards, because it could be the case—the Court expresses no opinion on
7   the matter—that the standards therein permit force that the Constitution does not. Conversely,
8   the use of force beyond what is permitted in that internal regulation would not constitute a
9   constitutional violation simply because the regulation did not permit it. Whether an internal
10  regulation permits, prohibits, or is silent concerning the use of a particular kind of force, the
11  Constitution supplies the standard for a constitutional claim.

12  Second, Defendants provide the declaration of Senior Correctional Officer Cameron
13  Horsley. (*See* Horsley Decl., Feb. 10, 2011, ECF No. 22-2, at 17). During the relevant events,
14  Horsley was the Senior Officer of the Correctional Emergency Response Team ("CERT") at
15  ESP. (*Id.* ¶ 2). On January 31, 2010, Minnix commanded Horsley to participate in the extraction
16  of Plaintiff from his cell, because Plaintiff, like several other inmates, had flooded his cell. (*Id.*
17  ¶ 3). Horsley's role was to assist in using chemical agents to Plaintiff's cell if he refused to
18  comply with orders. (*Id.*). During an extraction, officers give inmates the option to be
19  voluntarily restrained by putting their hands through the food slot on their cells for handcuffing.
20  (*Id.* ¶ 4).[2] If they comply, officers cuff them from without the cell, then enter and cuff their
21  ankles and extract them without incident. (*See id.*). If, however, an inmate refuses to be
22  restrained voluntarily, the commander of the extraction detail may choose to have chemical
23  agents applied to the inmate's cell to encourage compliance. (*Id.* ¶ 5). If the inmate still refuses
24  to be voluntarily restrained, the CERT team rushes the cell with a concave shield, forcibly

25  ―――――――――――――――
    [2]Hence, the "cuff up" command.

Page 7 of 13

1  restrains him, and escorts him from the cell; this is known as a "planned use of force." (*Id.*).[3] At
2  approximately 1805 hours[4] on January 31, 2010, officers used a planned use of force against
3  Plaintiff. (*Id.* ¶ 6). Horsley arrived at the cell and saw water both inside and outside the cell.
4  (*Id.*). Horsley ordered, or commanded another officer to order,[5] Plaintiff to submit to voluntary
5  restraint, but Plaintiff refused. (*Id.*). Horsley noticed that Plaintiff had a piece of material
6  wrapped around his face as a makeshift gas mask and was holding a mattress in front of him as a
7  makeshift shield. (*Id.* ¶ 7). Horsley and other officers gave Plaintiff multiple opportunities to
8  comply, and he refused, even after being sprayed with chemical agents each time. (*Id.*). The
9  preparation of a makeshift gas mask and shield indicates that Plaintiff intended not to cooperate
10 from the beginning, which he confirmed verbally and by refusing to be handcuffed voluntarily.
11 No officer instructed the camera operator to turn off the camera; however, it was later
12 determined that the camera had run out of tape during the extraction, because several extractions
13 had been performed that day, using up the tape. (*Id.* ¶ 8). An officer, whom Horsley does not
14 identify, was sent to retrieve a new tape immediately, and the camera was restarted as soon as
15 the new tape arrived. (*Id.*). Horsley concludes that none of the force he witnessed was excessive.
16 (*See id.* ¶ 9). As they exited the cell, an officer, whom Horsley does not identify, told him that
17 Plaintiff had used a weapon during the extraction, and that they had set the weapon on Plaintiff's
18 desk inside his cell. (*Id.*). Horsley saw that a "pick style shank was still on the desk." (*Id.*). In
19 the hallway an officer, whom Horsley does not identify, informed Horsley that Plaintiff had
20 stabbed one of the officers during the extraction, and that Horsley observed a wound in that

---

[3] As noted, *supra*, Plaintiff alleges that officers did not warn him before the second use of chemical agents. Likely, the CERT sprays a prisoner a second time immediately before entering his cell to both surprise and further incapacitate him, reducing the risk of physical injury to both the inmate and the officers during the inevitable grappling that will ensue.

[4] Horsley's use of military time clarifies that these events happened in the afternoon.

[5] Horsley uses the passive voice here.

officer's abdomen. (*Id.* ¶ 10).

Third, Defendants provide the declaration of Correctional Officer Joshua Postma. (*See* Postma Decl., Mar. 11, 2011, ECF No. 22-2, at 21).[6] Postma attests that he was part of the extraction team, and that he was the third person into Plaintiff's cell. (*See id.* ¶¶ 2, 5). As the team was restraining Plaintiff, Postma heard Officer Tom Stubbs say that Plaintiff had a weapon. (*Id.* ¶ 5).[7] Plaintiff struggled and attempted to keep his arms away from the officers, but Postma eventually secured his right wrist and put it behind his back, after which he and Deeds handcuffed him. (*Id.*). The officers then escorted Plaintiff to the hallway while his property was removed from his cell. (*Id.* ¶ 6). In the hallway, Plaintiff began resisting, and Minnix ordered him to be placed on the ground, but he was later placed back into his cell without further incident. (*Id.*). Postma did not strike Plaintiff during the incident and witnessed no other officer strike him. (*Id.* ¶ 7).

Fourth, Defendants provide the declaration of Correctional Officer Terrance Deeds. (*See* Deeds Decl., Feb. 24, 2011, ECF No. 22-2, at 24). Deeds was also part of the extraction team, and he was tasked with gaining control of the upper right part of Plaintiff's body. (*Id.* ¶¶ 2, 5). Deeds notes that Minnix applied chemical agents when Plaintiff refused to turn on his cell light and be voluntarily restrained. (*Id.* ¶ 5). Plaintiff was using the mattress to cover the food slot, so Deed used a broom handle to push it aside so Minnix could apply the chemical agents. (*Id.*).

---

[6]Plaintiff refers to Postma as "Postman." *See supra*.

[7]This piece of evidence is critical and is much more important than Horsley's claim that an unidentified officer told him Plaintiff had used a weapon. Stubbs's exclamation during a potentially life-and-death struggle with an inmate is clearly admissible through Postma's affidavit as an excited utterance, *see* Fed. R. Evid. 803(2), whereas the later statement to Horsley is probably inadmissible hearsay, though Horsley's direct observation of a weapon on Plaintiff's desk is admissible. Furthermore, the fact that the officers thought Plaintiff had a weapon made extreme force, even deadly force, reasonable under the circumstances. Horsley's attestation that he viewed the weapon afterwards only confirms that there was in fact a weapon, though the officers would still be protected from an excessive force claim if they wrongly, but actually, thought there was one.

1 Upon entering, Deeds also heard Stubbs shout that Plaintiff had a weapon. (*Id.* ¶ 6). Deed took
2 control of Plaintiff's right hand and took the weapon out of it. (*Id.*). Deeds later learned that
3 Stubbs had been stabbed with it. (*Id.*). Deeds kept control of Plaintiff's right arm until he was
4 handcuffed. (*Id.* ¶ 7). In the hallway, Plaintiff was put onto the floor twice for refusing to stay
5 against the wall. (*Id.*). After medical personnel evaluated him, he returned to his cell. (*Id.*).
6 Deeds did not strike Plaintiff during the incident and witnessed no other officer strike him.
7 (*Id.* ¶ 8).

8 Fifth, Defendants provide the declaration of Senor Correctional Officer Juston Perkins.
9 (*See* Perkins Decl., Feb. 28, 2011, ECF No. 22-3, at 2). Perkins's duty during the extraction was
10 to operate the video tape. (*Id.* ¶ 3). As the team was about to enter, Perkins noticed the tape was
11 running out and informed Minnix, who instructed an unidentified officer to retrieve a new tape.
12 (*See id.* ¶ 4). Perkins did not witness what occurred in Plaintiff's cell, because he was waiting by
13 the stairs for the new tape. (*Id.* ¶ 5). Three-to-five minutes later, the new tape arrived, but
14 Plaintiff had already been pulled from his cell when Perkins began recording again. (*Id.*).
15 Plaintiff began resisting while standing in the hallway, so he was put onto the floor. (*Id.* ¶ 6).
16 Officers stood Plaintiff up to be evaluated by medical personnel, and then they escorted him
17 back into his cell. (*Id.*). Perkins did not witness anyone strike Plaintiff. (*Id.* ¶ 7).

18 Sixth, Defendants adduce a video of the cell extraction as Exhibit F to their motion. The
19 magistrate judge noted that Defendants had not properly authenticated this video evidence, the
20 use-of-force regulation adduced as Exhibit A, or a photograph of the weapon they separately
21 adduced.

22 Seventh, Defendants provide the declaration of Correctional Nurse Jon Garner. (*See*
23 Garner Decl., Feb. 27, 2011, ECF No. 22-3, at 7). Garner is a registered nurse with over thirty
24 years of experience. (*Id.* ¶ 3). He was assigned to examine prisoners extracted from their cells
25 during the January 31, 2010 riot for injuries sustained during extractions. (*Id.* ¶ 2). He observed

the following when treating Plaintiff outside his cell: (1) a swollen right eye; (2) a bloody nose; and (3) abrasions and bruises on his face and back, which were not life threatening. (*Id.* ¶ 4). Garner assessed that Plaintiff was not in need of further immediate treatment and could receive follow-up treatment as necessary. (*Id.*). Garner was not present in the cell, but he was present when Plaintiff was restrained in the hallway, and he did not observe any officers strike Plaintiff. (*Id.* ¶ 7).

Plaintiff sufficiently alleged excessive force in his Complaint. Although the force used during the initial extraction was likely reasonable even under the allegations of the Complaint, the head-slamming and skin-pinching afterwards, if true, could constitute malicious force intended only to cause harm or pain if unnecessary to secure a prisoner under the circumstances. But although he initially stated a sufficient claim, Plaintiff has not produced evidence sufficient to withstand the present motion for summary judgment.

Because the Court finds that it can grant the motion for summary judgment without relying on the video or the photograph of the weapon, it will not address whether that evidence is properly authenticated. A video of actual extraction would be excellent evidence in this case, but it is not the only evidence. The Court has sworn statements indicating that Plaintiff refused to be voluntarily restrained, that he prepared to repel the inevitable extraction using a makeshift dagger, shield, and gas mask, and that he in fact stabbed one of the officers, who then alerted the rest of them that Plaintiff had a weapon. Plaintiff's actions within his cell, as recounted via several sworn declarations, would have justified deadly force, not only the harsh restraint he received. Defendants deny any malicious beating, and the nurse who witnessed Plaintiff's treatment in the hallway attests that he saw no one strike Plaintiff.

The magistrate judge's reliance on the lack of video evidence was improper. Video evidence is nice to have. It tends to settle matters fairly quickly in most cases, because it becomes clear if one or both parties have remembered an incident incorrectly or have unfairly

characterized an incident. This is presumably why officers typically use cameras in these situations—not for prisoners' protection, but for their own. But a video recording is only one type of evidence. The other evidence Defendants have adduced easily satisfies their initial burden on summary judgment. Defendants attest never to have stricken Plaintiff, maliciously or otherwise, in the cell or in the hallway, but only to have incapacitated him with chemical agents and restrained him by wrestling with him. The nurse attests to never having seen Defendants strike Plaintiff in the hallway. Defendants have met their initial burden on summary judgment.

Plaintiff has adduced no contrary evidence to meet his shifted burden. In addition to a copy of the use-of-force regulation, which again is irrelevant to a constitutional claim, and grievance forms and medical kites, Plaintiff adduces the declaration of Aaron Newman, a fellow inmate with his own separate complaint about being the subject of a cell extraction on the same day. (*See* Newman Decl., undated, ECF No. 25, at 39). He also adduces his own declaration, wherein he attests that Defendants stopped assaulting him before the camera came back on. (*See* Pratt Decl., undated, ECF No. 25, at 42). Plaintiff has not met his shifted burden on summary judgment. A reasonable jury could not return a verdict in his favor based on this evidence. The Court therefore grants summary judgment to Defendants on the excessive force claim and does not reach the issue of qualified immunity.

### B. Count II - Deliberate Indifference

To constitute cruel and unusual punishment, prison conditions must involve "the wanton and unnecessary infliction of pain." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Although prison conditions may be restrictive and harsh, prison officials must provide prisoners with food, clothing, shelter, sanitation, medical care, and personal safety. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Prison officials may be held liable only if they act with "deliberate indifference to a substantial risk of serious harm." *Frost v. Agnos*, 152 F.3d 1124, (9th Cir. 1998) (citing *id.* at 835). Courts apply a conjunctive, two-part test to determine "deliberate indifference." First, the

alleged deprivation must be objectively "sufficiently serious." *Farmer*, 511 U.S. at 834 (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Second, the prison official must "know of and disregard an excessive risk to inmate health or safety." *Id*. at 837. Thus, "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 835. A prisoner's claim of inadequate medical needs does not constitute cruel and unusual punishment unless the mistreatment rises to the level of "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "Deliberate indifference is a high legal standard. A showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004).

The evidence adduced by Defendants indicates that Plaintiff's injuries were not so serious to require further prompt treatment, and residual stinging from tear gas or pepper spray, though surely uncomfortable, is not sufficiently serious to constitute an "excessive risk to inmate health or safety."

## CONCLUSION

IT IS HEREBY ORDERED that the Report and Recommendation (ECF No. 34) is REJECTED.

IT IS FURTHER ORDERED that the Motion for Summary Judgment (ECF No. 22) is GRANTED.

IT IS FURTHER ORDERED that the Clerk shall enter judgment and close the case.

IT IS SO ORDERED.

Dated this 2nd day of February, 2012.

_____
ROBERT C. JONES
United States District Judge